[Civ. No. 1617.    Third Appellate District.—February 1, 1917.]

## S. C. LILLIS, Respondent, v. SILVER CREEK & PANOCHE LAND & WATER COMPANY (a Corporation), et al., Defendants; BELMORE LAND & WATER COMPANY (a Corporation), Appellant.

WATER RIGHTS—REFORMATION OF CONTRACT—QUANTITY TO WHICH PLAINTIFF ENTITLED—UNCERTAINTY OF DECREE.—In an action for the reformation of a contract made between a water company and the predecessor in interest of the plaintiff, whereby it was stipulated and agreed that the latter was entitled to divert upon his lands, from the irrigating canal of the water company, a certain quantity of water, a decree that the use of "75 cubic inches flowing per second" had been designated in the contract by mutual mistake, when the parties intended a use of "75 cubic inches measured under a 4-inch pressure," leaves the exact quantity of water to which the plaintiff is entitled unascertained, as such expression has no meaning whatever as applied to the measurement of a flowing stream.

ID.—MINER'S INCH OF WATER.—A miner's inch of water is the equivalent or equal to one and a half cubic feet of water per minute measured through any aperture or orifice, making it equivalent to one-fortieth of a second-foot.

APPEAL from a judgment of the Superior Court of Tulare County.  J. A. Allen, Judge.

The facts are stated in the opinion of the court.

Bennett, Turnbull & Thompson, for Appellant.

Short & Sutherland, for Respondent.

HART, J.—This appeal is by the Belmore Land & Water Company from the judgment in favor of the plaintiff upon a transcript of the testimony prepared by the phonographic reporter under section 953a of the Code of Civil Procedure.

The action is for the reformation of a certain contract, made on the third day of March, 1904, and duly entered and filed of record in the office of the county recorder of Fresno County on the second day of November, 1905, by and between the defendant, Silver Creek & Panoche Land & Water Company, and one W. J. Hayes, predecessor in interest of the plaintiff, and whereby it was stipulated and agreed that said Hayes was entitled to the use of and to divert upon his lands, from the irrigating canal of the Panoche company, a certain quantity of water, such diversion to be made by means of a lateral connected with the main canal.

The controversy here arises over a dispute between the parties as to the quantity of water to which the parties intended, by their agreement, to stipulate and agree that said Hayes should be entitled. The contract is set out *in haec verba* in the complaint, and in the respect as to which the dispute here has arisen reads as follows: " . . . It is hereby understood and agreed that said second party is entitled to use upon any portion of his said land the water flowing in first party's canal from said Panoche creek at all times when the quantity of water flowing therein does not exceed 75 cubic inches flowing per second when the same reaches the land of said second party." In a number of other places in the said contract the quantity of water to which it is agreed that the second party should be entitled is designated as above given.

The contention of the plaintiff was, however, that the parties to the contract intended to say and that the contract was intended to read and mean that the second party should be entitled to a flow of "75 miner's inches" instead of a flow of "75 cubic inches," as the agreement was made to read. Accordingly, the complaint, by appropriate and sufficient averments, sets forth that it was the true intention of the parties to the said contract to write in and express therein, in lieu of the words "75 cubic inches flowing per second," wherever said words appear in said agreement, the words "75 miner's inches," and that the words, "75 cubic inches flowing per second," as so used to define the quantity of water which

the said second party (Hayes) should be entitled to divert under said agreement, were written therein by and through the mutual mistake of the parties thereto; that, in conformity with the real intention of the parties to said agreement and *ever since the execution thereof, and down to the second day* of January, 1910, the plaintiff and his predecessors in title have taken water from said main water ditch or canal for the irrigation of the land of the plaintiff described in the complaint; that during all of said period said water has been diverted from said main canal through and by means of a lateral ditch sufficient in size to carry seventy-five miner's inches of water, and that said quantity of water has been so diverted by the plaintiff and his predecessors in title during the irrigating season in each year since the execution of said contract "and whenever said water has been needed for the irrigation of the land now owned by the plaintiff as aforesaid."

It is shown by the complaint that on the land of the plaintiff irrigated by means of the canal and lateral in question "there is growing about thirty acres of alfalfa, and that there is now, and will continue to be, needed on said land, water for the purpose of irrigating said alfalfa and other crops."

It is alleged that the defendant and appellant, Belmore Land & Water Company, has or claims to have succeeded to the right and interest of the defendant, Panoche company, in and to the ditch or canal "above described"; that, "on or about the second day of January, 1910, the defendant, Belmore Land & Water Company, without any right, and against the will of the plaintiff, erected an obstruction in said lateral ditch, at the point where the same diverts water from said main water ditch or canal, by reason of which water was and now is prevented from passing from the said water ditch or canal to the land of the plaintiff above described, and that by reason of such obstruction to the flow of water plaintiff has been deprived of all water necessary to irrigate said alfalfa." It is alleged that "the facts constituting said mistake were not discovered by the plaintiff, nor by any predecessors in title of the plaintiff, more than three years prior to the commencement of this action; that said facts and said mistake were discovered by the plaintiff on or about the second day of January, 1910, and said facts and said mis-

take were unknown to the plaintiff and to his predecessors in title prior to said date.''

Besides seeking a reformation of the contract in the particular mentioned and a decree adjudging him to be entitled to divert and use upon his land from the appellant's canal the quantity of water designated in said contract as so revised, the plaintiff asks for an injunction *pendente lite,* restraining the defendants from interfering with the plaintiff in removing the obstruction which prevents water from flowing ''into said lateral ditch as it has been accustomed heretofore to flow, and interfering with plaintiff's use of said ditch and his taking water from said main canal to irrigate his said land,'' etc.

A demurrer, upon both general and special grounds, was interposed by the appellant and the same by the court sustained. Judgment was thereupon entered in favor of the appellant, and an appeal therefrom was taken by the respondent here. The cause came to this court by transfer from the supreme court, and the judgment was by this court reversed, with directions to the court below to overrule the demurrer, and a petition to have the case heard by the supreme court after judgment by this court was denied. (*Lillis* v. *Silver Creek & Panoche Land & Water Co.,* 21 Cal. App. 234, [131 Pac. 344].)

The defendants by their several and respective answers deny all the material averments of the complaint, and allege that the contract as executed by the parties thereto and filed for record expressed the real intention of said parties as to the quantity of water which the plaintiff's predecessor in title and the plaintiff were entitled to have diverted from the appellant's canal to the lands of the former for the purpose of irrigating the same.

The court found that at and prior to the time at which the agreement in question was made and executed, the immediate parties thereto intended that said contract should mean, and that the legal consequences thereof should be, that said Hayes (second party and predecessor in title of the plaintiff) should be entitled to take from the appellant's canal for use upon his (now plaintiff's) land at all times water to the amount and quantity of 75 cubic inches measured under a four-inch pressure; that, through a mutual mistake of the original parties to the contract, the said contract, as to the provision defining the quantity of water to be so taken and used, was made

to read "75 cubic inches," etc., in lieu of "75 cubic inches, measured under a 4-inch pressure," as the parties intended the agreement to read.

It will be observed that, notwithstanding that the complaint alleges that the contract should have been made to read, according to the real intention of the parties, "75 miner's inches" instead of "75 cubic inches flowing per second," the court found that the contract should be so revised as to give to the plaintiff the right to divert from the canal "75 cubic inches of water, measured under a 4-inch pressure." This finding corresponds strictly with the testimony presented, aside from the agreement itself, upon the question of the intention of the parties as to the quantity of water which the plaintiff and his predecessor in title were to be entitled to divert from the canal for the purpose stated in the complaint.

It is very clear, from the evidence, that the provision in the written agreement purporting to fix the amount of water which Hayes should be entitled to take from the canal does not state or specify the quantity which it was the real intention of the parties that he should be entitled so to divert, and that the amount so fixed was the result of the mutual mistake of the parties to the agreement; for, as was said by this court in this case when it was before us on the former appeal, above referred to: "The quantity [of water] mentioned in the contract would hardly be sufficient to find its way through a ditch during the irrigating season." In fact, the term, "cubic inch per second," as used in the contract, is one that has never to our knowledge heretofore been used in California in connection with the measurement of water to be used for any purpose and one that would, if generally used, almost invariably lead to absurd consequences. Particularly would this be so in the case where, as here, the measurement is for the purpose of apportioning water for the purposes of irrigation, since, as we think will be found to be true upon an arithmetical analysis of the phrase, 75 cubic inches per second are the equivalent only of 0.32 of one gallon per second. Obviously, such a quantity of water would be absolutely valueless or without utility for practical purposes of irrigation. This proposition alone or of itself would seem to be sufficient to sustain the conclusion that the parties to the agreement in question had mutually fallen into an error

in attempting to define the quantity of water which was by said agreement to be awarded to one of them for the irrigation of his land for agricultural purposes. No sane person would purposely limit his right to the use of water for irrigating his land to a quantity which could not be of any possible benefit to him, or, indeed, which could not be utilized at all.

That the Panoche company conceded that Hayes was entitled to divert a quantity of the waters running into its canal from Panoche Creek sufficient to irrigate his land for agricultural purposes, is incontestably shown by the fact itself of the making of the contract. The dispute between them, which was of long standing, was merely as to the quantity of water which Hayes should be entitled to divert from the canal. The evidence shows that, after negotiations between the two parties extending over a long period of time, during which, with a view to avoiding litigation, a correspondence relating to the dispute was carried on between the attorneys of the respective disputants, an agreement was finally reached and reduced to writing, whereby the amount of water Hayes was to be entitled to divert from said canal and use upon his land was supposed to be specifically apportioned and definitely specified. The letters passing between the attorneys of the parties and a draft of a written contract which was not used, because it provided for ''100 cubic inches of water measured under a 4-inch pressure'' (twenty-five such inches more than the Panoche company was willing to concede to Hayes), unquestionably show that the understanding arrived at between Hayes and the Panoche company was that the former should, at all times, when necessary to his purposes, be entitled to divert from the canal and thence to his land a quantity of water equal in amount to ''seventy-five cubic inches of water, measured under a 4-inch pressure.'' Whatever the quantity so defined amounts to, if, indeed, the phrase means anything at all as a unit in water measurement for any purpose, it is clear that the attorneys conducting the negotiations leading to the execution of the agreement, as well as the trial court in this case, were of the opinion and believed that a quantity of water equal in amount to ''75 cubic inches, measured under a 4-inch pressure,'' would be amply sufficient to subserve the purposes of Hayes.

But the serious question now confronts us: What does the expression, ''75 cubic inches of water, measured under a

four-inch pressure," mean? In other words, what is the precise quantity of water which the court has thus found that the plaintiff is entitled to divert from the appellant's canal? Did the court intend so to revise the agreement as to make it provide that the plaintiff should be entitled to use, as the complaint alleges was the real intention of the parties, "75 miner's inches of water," and conceived that "75 cubic inches of water, measured under a 4-inch pressure," were the equivalent of seventy-five miner's inches?

The miner's inch of water, as fixed by statute in California, is defined as follows: "The standard miner's inch of water, shall be equivalent or equal to one and one half cubic feet of water per minute, measured through any aperture or orifice." (Stats. 1901, p. 660.) This makes the miner's inch equivalent to one-fortieth of a second-foot. Prior to the adoption of the above statute, an inch or miner's inch in this state was defined as the quantity of water passing through an orifice one inch square under a four-inch pressure, which would make the inch equivalent to one-fiftieth of a cubic foot per second. Under the statutory definition or standard, above given, seventy-five inches or miner's inches would amount to ninety cubic feet per minute, or 673.2 gallons per minute, or 11.2 gallons per second. These figures, confirmed by the opinion of the state engineering department, are based upon definite, well-defined, and well-understood standards or units of water measurement. The expression, "a cubic inch measured under a 4-inch pressure," conveys to our minds no meaning whatever. Indeed, we are advised by the authority above referred to that "the expression, '75 cubic inches measured under a four-inch pressure,' has no meaning whatever as applied to the measurement of a flowing stream."

Thus the decree leaves the whole matter of quantity "up in the air." No one can say how much water the plaintiff may, under the decree, divert from the appellant's canal. The rights of the parties are not defined with sufficient definiteness to enable either to know when the other is going beyond his rights. If the plaintiff, conceiving that, under the terms of the decree, he was entitled to divert more than seventy-five miner's inches, and should do so to the detriment of the appellant, how may it be told from the decree that he (the plaintiff) is not justified in diverting such quantity of water? Or, on the other hand, if the appellant should so obstruct

appellant's gate or weir as to prevent the passage into his lateral of a sufficient flow for his purposes, who can say, from the decree, that the appellant would not be within its just rights in so doing? But counsel for the respondent declare that the phrase adopted by the court in specifying the quantity of water to which the plaintiff is entitled is well understood in hydraulics, and conveys a definite meaning as to the quantity it expresses. They refer to Kinney on Irrigation and Water Rights, second edition, section 890, as in confirmation of their statement, and assert that "none of the writers of 'books on water rights' would have had the least difficulty in determining the meaning of the language used by the trial court in its decree."

But neither Kinney nor counsel tell us how much water is comprehended within or expressed by the language of the decree. They do not say or, so far as their briefs go, claim that a cubic inch of water measured under a four-inch pressure is equal to a miner's inch. If it is not, is it less or is it more than a miner's inch, according to their conception of its description? The fact is, as stated, that the phrase, "cubic inch measured under a 4-inch pressure," is unknown in hydraulics as a unit of measurement and, as the state engineer has declared, has no meaning whatever as applied to the measurement of a flowing stream.

It necessarily follows from the foregoing that the trial court wholly failed to ascertain and find the exact quantity of water to which the plaintiff is entitled under the agreement, and that the decree is likewise deficient and does not define or adjudicate definitely or at all the respective rights of the parties to the agreement. Obviously, the parties are entitled to know exactly what their respective rights are judicially determined to be.

In all other respects than the above the findings are supported and the decree is definite and sufficient. The only question which we have thus far not considered is whether the appellant purchased the water rights and canal in question in ignorance of the rights of the plaintiff. As to this proposition, it should be said that the evidence shows that the appellant's president, Farnham, visited and inspected the canal prior to the purchase and while his company was negotiating for the purchase of the ditch; that he saw the plaintiff's lateral and gate and was informed that the latter

had and was exercising certain rights in the waters of Panoche Creek as the same were carried through said canal; that Farnham made no special effort at any time before the purchase to ascertain precisely to what extent the plaintiff was entitled to use the water from the canal; that the gate and lateral of the plaintiff as the same were then and had been for a number of years used by him had been so constructed and were being so maintained as that he was thus enabled to divert from the canal and thence to his land an infinitely greater quantity of water than the agreement provided for. But, without further reference to the evidence in this particular, it is sufficient to say that, on the whole, the proofs disclose that Farnham and the appellant through him, prior to the purchase by the latter of the canal, had "actual notice of circumstances sufficient to put a prudent man upon inquiry" as to the extent of the plaintiff's rights in the waters carried by the canal, and hence had constructive notice of the fact itself, and could have learned the fact had he prosecuted the inquiry. (Civ. Code, sec. 19; 2 Pomeroy's Equity Jurisprudence, sec. 11.)

It follows from the foregoing that the question as to the precise quantity of water which the plaintiff is entitled to divert from the canal to and upon his land is the only one left for retrial.

The judgment is reversed and the cause remanded, with instructions to the trial court to hear and consider only such further evidence as may be produced before it upon the question of the quantity of water which the parties to the agreement in question intended that the plaintiff should be entitled to divert from the appellant's ditch or canal and thence to his land.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 2, 1917.