[Civ. No. 20289. First Dist., Div. One. Jan. 28, 1963.]

ELSIE FRUSTUCK, Plaintiff and Appellant, v. CITY OF
FAIRFAX, Defendant and Appellant.

Gardiner, Riede & Elliott and Samuel H. Gardiner for Plaintiff and Appellant.

Wallace S. Myers for Defendant and Appellant.

MOLINARI, J.—This is an appeal by both parties to this litigation. The defendant, City of Fairfax, hereinafter sometimes referred to as the City, has appealed from the judgment and from the order after judgment for partial satisfaction of judgment and permanent injunction. The plaintiff, Elsie Frustuck, hereinafter sometimes referred to as Frustuck, has appealed from the said order after judgment.

### Statement of the Case

The parties to this litigation are generally in accord with the following narrative of facts which are in the record before us. Frustuck owns a parcel of land in the City of Fairfax approximately 49 feet wide by 150 feet long. Said parcel is bounded on three sides by streets of Fairfax; the easterly boundary thereof being coterminous with the westerly line of Sir Francis Drake Boulevard; the southerly boundary with the northerly line of Azalea Avenue; and the westerly boundary with the easterly line of Broadway. Sir Francis Drake Boulevard is approximately 8 feet higher than Broadway along plaintiff's property. The contour of the land northeasterly from the Frustuck property is upward from Sir Francis Drake Boulevard, over property owned by the Pacific Gas and Electric Company, property owned by the Catholic Church, and thence upward on the same watershed into lands hereinafter referred to as Marinda Oaks.

For many years last past, water falling on Marinda Oaks came down upon the lands of the Catholic Church, from whence a portion of such waters then flowed on down over lands owned by the Pacific Gas and Electric Company to a point on the easterly side of Sir Francis Drake Boulevard at about opposite the northerly end of the Frustuck property.

Many years ago, a 20-inch culvert was placed under Sir Francis Drake Boulevard running from a catch basin at the point on the easterly side thereof, above referred to, to the northeasterly corner of the Frustuck property. Water flowing through said culvert was captured by a ditch on the easterly side of said property. Said ditch was formed by the bed of a railroad track right of way which formerly ran through the approximate center of the Frustuck property. At a point near the center of the property there is a wooden catch basin feeding an 18-inch culvert running at right angles to said ditch across the property to Broadway. Waters which could not be handled by the 18-inch culvert continued along said ditch along the easterly side of the old railroad right of way and across Azalea Avenue.

Drainage problems arose from time to time in this general area, becoming aggravated between 1951 and 1957, when Marinda Oaks was subdivided into five subdivisions and a school development was made on the Catholic Church property. The paving of the streets and the installation of drainage facilities in these subdivisions together with said

school development caused an acceleration of the flow of water over the Pacific Gas and Electric Company property and ultimately upon Frustuck's land. By 1958, the aforementioned culvert under Sir Francis Drake Boulevard became dilapidated to some extent, and during very heavy storms it would not take all of the surface waters flowing to that point, with the result that water flowed over said boulevard and upon Frustuck's property.

In September of 1958, the City placed a 24-inch culvert under Sir Francis Drake Boulevard near and parallel with the old 20-inch culvert, the discharge end of said new 24-inch culvert being close to the northeasterly end of Frustuck's property. At or about the same time, the City, purporting to act under an ordinance which permitted it to clean out drainage ditches, but without the express consent of Frustuck, entered into and upon Frustuck's property and cleaned out the aforementioned ditch. While performing said work the City also enlarged the ditch for the full length thereof, and in so doing piled up some of the dirt, debris, rock and rank growth along the lower bank of the ditch to form a sort of berm.

Frustuck filed a claim against the City for $15,000 damages, for inverse condemnation, and for trespass. The claim was rejected and Frustuck thereupon filed a complaint against the City in three counts whereby she sought an injunction, damages for inverse condemnation, and damages for trespass. The City answered, denying the allegations of the complaint generally and asserting affirmatively that a public easement for drainage had existed over Frustuck's land from "time immemorial"; that it was required to enter upon said land temporarily pursuant to ordinance in order to clean out the ditch because plaintiff had permitted the said easement to become clogged with debris, thus impairing the passage of normal drainage over said land; and that plaintiff's claim was barred by the statute of limitations.

In addition to the testimony taken at the trial, the trial court, pursuant to stipulation, viewed the drains and the conformation of the land in the presence of counsel, and viewed and considered official maps and drainage systems as shown thereon. Illustrations were made on a blackboard in connection with testimony regarding drainage areas, but these have not been brought up on this appeal.

The trial court made certain findings pertinent to this

appeal to which we shall hereafter allude. Pursuant to said findings judgment was entered for the plaintiff for damages in the sum of $150 for trespass, for costs in the sum of $51.25. Said judgment also provided in substance that the plaintiff was entitled to $5,000 damages for inverse condemnation unless, within four months after the judgment became final, the City would divert the flow of water in excess of that which could be carried by a 20-inch culvert, in which event the $5,000 would not be payable, but a permanent injunction would be made enjoining and restraining the City from depositing any such excess waters upon plaintiff's property.[1] Execution of the judgment to said item of $5,000 damages was stayed until the expiration of said four months' period. Thereafter, and within said four months' period, the City moved for an order entering satisfaction of judgment. This motion was supported by an affidavit to the effect that the total sum of $201.25 had been paid by the City to the plaintiff in satisfaction of the $150 judgment and the sum of $51.25 representing the plaintiff's costs of suit; and was supported by another affidavit to the effect that the City had reduced the capacity of the new culvert leading to plaintiff's property to 20 inches and that the City had erected works (which were therein described) which would divert any of the waters in excess of those which could be normally handled by a 20-inch culvert. An affidavit in opposition to such motion was executed and filed by plaintiff's attorney, the purport of which was that the work performed for the purpose of diverting the excess waters was and would be ineffective and that it would prevent ingress to and egress from said property. Upon these affidavits the trial court made an "Order for Partial Satisfaction of Judgment and Permanent Injunction."[2] The trial court thereupon ordered, adjudged and decreed that a partial satisfaction in the sum of $201.25 be entered, and that the plaintiff was entitled to a permanent injunction enjoining and restraining the City from depositing any waters on plaintiff's property in excess of those within the capacity of a 20-inch culvert. In said order the trial court reserved "jurisdiction to grant appropriate relief for any violation of the terms of said Judgment or this permanent injunction."

---

[1]The specific provisions of said judgment will be hereafter set out with more particularity where necessary.

[2]Included in said order are certain findings which will be hereinafter referred to.

*The City's Contentions on Appeal*

1. That the trial court erred in awarding damages and an injunction because there is no evidence that the City participated in any diversion of water to the plaintiff's property.

2. That the trial court erred in holding that the City was estopped to assert the defense of the statute of limitations.

3. That there was no substantial damage to the plaintiff's property caused by trespass.

4. That the conduct of the City did not constitute an act of inverse condemnation.

*Frustuck's Contentions on Appeal*

That the order after judgment should be reversed and vacated because:

1. It digresses from the conditions fixed in the judgment.

2. The order substituting an injunction for the damages awarded for inverse condemnation was improper.

*The City's Liability*

■ The City's liability in the instant case, if any, must be predicated upon the liability imposed under article I, section 14 of the California Constitution which provides that "[p]rivate property shall not be taken or damaged for public use without just compensation having first been made to . . . the owner. . . ." The said constitutional provision applies to municipal corporations such as the City of Fairfax. (*Archer* v. *City of Los Angeles,* 19 Cal.2d 19 [119 P.2d 1]; *Beals* v. *City of Los Angeles,* 23 Cal.2d 381 [144 P.2d 839]; *City & County of San Francisco* v. *Ross,* 44 Cal.2d 52 [279 P.2d 529].) ■ The appropriate action based on section 14 is sometimes designated a proceeding in inverse condemnation (*Bauer* v. *County of Ventura,* 45 Cal.2d 276, 282 [289 P.2d 1]), and, as such, includes within its purview actions for damages caused by the diversion of water from its natural course (*Youngblood* v. *Los Angeles County Flood Control Dist.,* 56 Cal.2d 603, 607-608 [15 Cal.Rptr. 904, 364 P.2d 840]; *Bauer* v. *County of Ventura, supra,* p. 283; *Archer* v. *City of Los Angeles, supra,* p. 26) and actions for trespass (*Jacobsen* v. *Superior Court,* 192 Cal. 319 [219 P. 986, 29 A.L.R. 1399]). ■ This section of the Constitution does not, however, create a new cause of action but gives to the private property owner a remedy he would not otherwise have against the state or its subdivisions for unlawful dispossession, destruction or damage to his property. ■ Accordingly, if the property owner would have no

cause of action against a private citizen on the same facts, he can have no claim for compensation under section 14. He must, therefore, show not only a taking or damaging for a public use but also that such taking or damaging is actionable under general law. (*Bauer* v. *County of Ventura, supra,* pp. 282-283.) ''Public use'' within the meaning of this section is a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government. (*Bauer* v. *County of Ventura, supra,* p. 284.)

Basically, the question presented by the instant case is whether there has been a taking or damaging by the City for a public use so as to entitle the plaintiff to compensation. The ordinary taking of private property for the purpose of constructing storm drainage systems is a taking for a public use, the obvious reasons for such taking being for the purpose of providing adequate normal drainage and to control flood waters. Where there is such a taking the public becomes principally entitled to the use and enjoyment of the private property. (*Bauer* v. *County of Ventura, supra,* p. 284.) The public purpose is served equally by the proper maintenance of the drainage improvement once it is made. The consequence of faulty maintenance may, in some instances, assume a public importance equal to that of the original construction so as to result in a taking or damaging of private property for a public use. (*Bauer* v. *County of Ventura, supra,* p. 285.)

In the instant case the plaintiff, in her complaint, alleged that the acts of inverse condemnation consisted of the entry by the City upon and the taking of possession of her property, the construction and installation of improvements thereon, the installation of the culvert leading thereinto, and the excavation of a large drainage ditch thereon, and the stacking and piling of materials from such ditch and other sources upon the remaining portions of said property. The trial court made specific findings with respect to these allegations. The court below also made additional findings not encompassed by the pleadings, to wit: that the City was a party to the diversion of waters which were caused to flow over Sir Francis Drake Boulevard and upon Frustuck's land. Although such diversion was not alleged in the complaint and issue thereon was not tendered, the case was tried as if this issue were before it and evidence was adduced thereon at the trial by both parties. Accordingly, the trial

court's findings with reference to such diversion are appropriate if supported by the evidence under the familiar rule that the parties may enlarge the issues by canvassing at the trial a matter not technically included within the averments of the pleadings. (*Kalmus* v. *Cedars of Lebanon Hospital,* 132 Cal.App.2d 243, 246 [281 P.2d 872]; *Freeman* v. *Gray-Cowan, Inc.,* 219 Cal. 85, 87 [25 P.2d 415].)

The trial court, in essence, found that there were three instances of inverse condemnation, to wit: (1) The diversion of drainage waters; (2) the construction of the 24-inch culvert; and (3) the excavation and enlargement of the ditch and the piling of waste lengthwise along said ditch. The trial court also found that the City had, under its police power and pursuant to ordinance, the right to enter upon all watercourses for the purpose of cleaning the same and that the entry for this purpose did not constitute a trespass. This finding is not challenged by either of the parties.

Before proceeding to a consideration of the trial court's findings it would be well to review briefly the law of this state with respect to the discharge and flow of surface waters. ▆▆ It is well established that a lower owner has no right of redress for injury to his land caused by improvements made within an existing watercourse or channel for the purpose of draining or protecting the land above, even though the flow of water is accelerated and even though the channel is inadequate to accommodate the increased flow of water resulting from the improvements. ▆▆ Accordingly, the straightening, widening or deepening of the channel of a stream to improve the collection of surface waters for the discharge into their natural stream entails no liability in the event of a resulting overflow. Such improvements must, however, follow the natural drainage of the country or the natural stream. ▆▆ If the water is diverted out of its natural channel and discharged into another channel or upon neighboring land the diverter is liable to an owner whose land is injured by the discharge. (*Bauer* v. *County of Ventura, supra,* p. 283; *Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19, 24-28; *Youngblood* v. *Los Angeles County Flood Control Dist., supra,* 56 Cal.2d 603, 607.)

▆▆ The diversion of water from its natural course resulting in damage to adjacent property being actionable against a private citizen is also actionable against a public agency where it amounts to a taking or damaging for a

public use. (*Bauer* v. *County of Ventura, supra; Archer* v. *City of Los Angeles, supra.*)

*Did the City Participate in the Diversion of Waters?*

The trial court found that a public easement exists across plaintiff's land for the purpose of carrying storm waters to the extent that can be carried by a 20-inch culvert. It also found that the ditch created by the built-up railroad roadbed had existed for such time in the past as to have all of the physical features attributable to a water channel natural in origin. The propriety of these findings is not questioned by either of the parties. The lower court found further that the development and improvement of the higher lands to the northeast resulted in an increase in flowage of waters upon Frustuck's property which would naturally drain across said property. It also found that additional waters were caused to flow upon said land because of such improvements in that these improvements caused a diversion of storm waters from their natural channels in such a manner that such additional water could not be handled by the 20-inch culvert and was thus caused to flow over Sir Francis Drake Boulevard and upon plaintiff's land. With respect to this latter finding the court below also found that the City was a party to the diversion of these waters "in that it approved and accepted the creation of roads and drainage easements in the various subdivisions comprising the Marinda Oak area which are the chief source of the diverted water"; and further found "that said waters flow through intervening improvements of private property owners which carry them into the drainage area in which plaintiff's property lies, and that defendant accepted said Marinda Oaks improvement with knowledge that the water arising thereon would be so diverted and without provision for preventing the same."

The City asserts that there is no evidence that the City participated in any diversion of water to plaintiff's property. It relies upon the testimony of a witness for the plaintiff, Frank J. Main, who testified: that prior to the construction of certain school improvements upon the Catholic Church property in 1956 or 1957, 50 per cent of the water from the Marinda Oaks area, which came upon the church property, flowed into the area known as Claus Circle and that 50 per cent flowed therefrom onto the lower lands of the Pacific Gas and Electric Company and thence to the catch basin leading into the subject 20-inch culvert to the plaintiff's land;

and that after the church property improvements from 50 to 75 per cent of such waters were diverted over and upon the Pacific Gas and Electric Company property and ultimately to the said catch basin. It should be noted, here, that the plaintiff herself testified that prior to 1950 water falling on Marinda Oaks came down upon the lands of the Catholic Church and then broke into three channels with each taking about an equal amount of water, i.e., one-third of the storm waters went to the Claus Circle area; one-third to the northwest opposite Rubini's Restaurant; and about one-third coming over to the Pacific Gas and Electric Company lands and thence through the 20-inch culvert onto the Frustuck property.

The City concedes that a diversion of the water was brought about by the construction of the school improvement, but asserts that the diversion was made by the Catholic Church and not by the City. The City contends that notwithstanding the subdivision and improvement of Marinda Oaks there was no diversion of water from its normal channel until it reached the locale of diversion on the church property, and that any increased flow from Marinda Oaks to the church property which may have been caused by such subdivision work and improvements was merely an acceleration of waters through the natural channels. There was direct testimony to the effect that the Marinda Oaks development increased the amount of water runoff because of the paving of the streets, but there was no direct testimony to the effect that the Marinda Oaks development caused any diversion of waters. Testimony was adduced, however, that from 1950 to 1958 a number of subdivision maps and construction plans for said development were presented to and approved by the City's council and its engineer, and that these maps and plans included drainage plans for said subdivision. The originals of these maps and construction plans, including the drainage systems shown thereon, were official county records and were examined by the trial court pursuant to stipulation. The trial court also viewed, pursuant to stipulation, the Marinda Oaks area, the said school grounds, as well as the general area surrounding the Frustuck property. ▮▮▮ Whatever is viewed by a trial judge with the consent of the parties becomes independent evidence which can be considered by him in arriving at his conclusion and is substantial evidence in support of findings consonant therewith. (*Key* v. *McCabe,*

54 Cal.2d 736, 739 [8 Cal.Rptr. 425, 356 P.2d 169].) Such evidence may be used alone or with other evidence to support the findings. (*Noble* v. *Kertz & Sons Feed etc. Co.*, 72 Cal.App.2d 153, 159 [164 P.2d 257].) Moreover, when a record of what the trial judge viewed has not been made part of the transcript on appeal, an appellate court must assume that the evidence acquired by such view is sufficient to sustain the finding in question. (*1st Olympic Corp.* v. *Hawryluk*, 185 Cal.App.2d 832, 837 [8 Cal.Rptr. 728].) Accordingly, in the light of these established principles, we must assume that the evidence acquired by the trial judge from such view of the maps, plans, and the areas visited by him was sufficient to sustain his findings that there was a diversion of waters and a participation in such diversion by the City.

 The liability of the City is not necessarily predicated upon the doing by it of the actual physical act of diversion. The basis of liability is its failure, in the exercise of its governmental power, to appreciate the probability that the drainage system from Marinda Oaks to the Frustuck property, functioning as deliberately conceived, and as altered and maintained by the diversion of waters from their normal channels, would result in some damage to private property. (*Youngblood* v. *Los Angeles County Flood Control Dist.*, *supra*, 56 Cal.2d 603, 607; *Bauer* v. *County of Ventura*, *supra*, p. 285; *Ward Concrete Products Co.* v. *Los Angeles County Flood etc. Dist.*, 149 Cal.App.2d 840, 846-847 [309 P.2d 546].) Drainage systems concern the whole community. Their construction and maintenance become a matter of public policy and are subjects of independent statute. (*Bauer* v. *County of Ventura*, *supra*, p. 285.) They are, as here, proper subjects for the required approval by public agencies. The approval of the subdivision maps and plans which include drainage systems, as well as the approval which we are entitled to presume was given to the construction of the improvement on the church property by the City in the performance of official duty (Code Civ. Proc., § 1963, subd. 15), constitute a substantial participation incident to the serving of a public purpose. Such drainage systems when accepted and approved by the City become a public improvement and part of its system of public works. (*Steiger* v. *City of San Diego*, 163 Cal.App.2d 110 [329 P.2d 94].) The fact that the work is performed by a contractor, subdivider or a private owner of property does not necessarily exonerate a public agency, if such contractor, subdivider or owner fol-

lows the plans and specifications furnished or approved by the public agency. When the work thus planned, specified and authorized results in an injury to adjacent property the liability is upon the public agency under its obligation to compensate for the damages resulting from the exercise of its governmental power. (*Heimann* v. *City of Los Angeles,* 30 Cal.2d 746, 756 [185 P.2d 597]; *Steiger* v. *City of San Diego, supra,* 163 Cal.App.2d 110, 113; *Alisal Sanitary Dist.* v. *Kennedy,* 180 Cal.App.2d 69, 82 [4 Cal.Rptr. 379].)

### The Construction of the 24-Inch Culvert

The diversion and acceleration of the waters hereinabove described had the effect of precipitating a substantial portion thereof to the catch basin on the easterly side of Sir Francis Drake Boulevard to the head of the 20-inch culvert leading to the Frustuck property. Surface waters that could not be handled by the culvert were caused to flow alongside the said boulevard, and at times, when the discharge of storm waters was excessive, would spill over the said roadway and on and into the Frustuck property. Such spilling over, because of the said diversion, likewise amounted to an act in inverse condemnation and would warrant compensation to Frustuck for any damage to the property caused by the overflow.

In order to alleviate this condition the City constructed a 24-inch culvert under Sir Francis Drake Boulevard alongside and parallel to the 20-inch culvert which was then capped. This culvert, because it was larger in diameter, increased the flow of water upon the Frustuck property with the result that such increase could not be handled by the ditch and the 18-inch culvert leading therefrom. The construction of this 24-inch culvert was in itself an act in inverse condemnation because, as properly found by the court, the discharge of the additional waters, substantially brought about by the diversion, increased the burden on plaintiff's property. Here, again, we have a "failure to appreciate the probability that, functioning as deliberately conceived," a damaging or appropriation would result by the construction of a new culvert larger in diameter under the principle announced by *Bauer* and *Youngblood.*

### The Enlargement of the Ditch

In order to compensate for the increased flow of water discharged by the 24-inch culvert, the City, without

the consent or permission of the plaintiff, undertook to enlarge the ditch on the Frustuck property and in so doing piled dirt, debris, rock and rank growth alongside the ditch. This amounted to an act of trespass as the court below properly found.[3] This finding is not challenged by the City. The City does, however, assert that such a single act of trespass does not constitute inverse condemnation. It is suggested by the City, without citation of authority, that there must be continuing acts of trespass in order to maintain an action for inverse condemnation. This contention is tenuous.

The taking and damaging of private property without compensation first being paid is in the field of tortious action. (*Douglass* v. *City of Los Angeles,* 5 Cal.2d 123, 128 [53 P.2d 353].) Its earliest application is to be found in the traditional trespass action. (*Fox* v. *Western Pac. R.R. Co.,* 31 Cal. 538; *Sherman* v. *Buick,* 32 Cal. 241 [91 Am.Dec. 577]; *Potter* v. *Ames,* 43 Cal. 75; *Robinson* v. *Southern Cal. Ry. Co.,* 129 Cal. 8 [61 P. 947]; *Jacobsen* v. *Superior Court, supra,* 192 Cal. 319.)

The nature of the inverse condemnation suit is that the owner whose property is taken or damaged for a public use without the institution of a condemnation proceeding himself takes the procedural initiative by bringing an action for damages inherent in the particular taking or damaging. (17 Cal.Jur.2d, Eminent Domain, § 7, p. 585; 18 Cal.Jur.2d, Eminent Domain, § 374, p. 95.) The inquiry posed by such an action is whether there has been a ''taking . . . for a 'public use'. . . .'' (*People* v. *Chevalier,* 52 Cal.2d 299, 304 [340 P.2d 598].) Such a taking is not restricted to a mere change of physical possession, but includes a permanent or temporary deprivation of the owner of the use or enjoyment of his land. (*Pacific Tel. etc. Co.* v. *Eshleman,* 166 Cal. 640, 664 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A. N.S. 652].) Thus it may consist of an act of dispossession, or of acts of appropriation, destruction or damage. (*People* v. *Peninsula Title Guar. Co.,* 47 Cal.2d 29 [301 P.2d 1]; *City of Long Beach* v. *Aistrup,* 164 Cal.App.2d 41 [330 P.2d 282].) Accordingly, it may consist of a single act. In *Ambrosini* v. *Alisal Sanitary Dist.,* 154 Cal.App.2d 720 [317 P.2d 33], the court held, in an action in inverse condemnation for damages to a celery crop, that a single act

---

[3]The trial court found that through the exercise of its police power and pursuant to ordinance, the city has the right to enter upon all watercourses for the purpose of cleaning the same.

constituting a nuisance was a sufficient basis for liability under article I, section 14 of the California Constitution. It is elementary, of course, that an action in trespass will lie against an individual. It therefore lies against a public agency under the rule hereinabove alluded to.

## Was the Plaintiff Damaged?

With respect to damages, the trial court found: ''That the increase or augmentation of the burden on plaintiff's property is and was an inverse condemnation by defendant City of Fairfax; that the acts of the defendant in the premises have damaged plaintiff and diminished the value of her property in the amount of $5,000; that the physical act of the City in enlarging the ditch on plaintiff's property damaged plaintiff in the sum of $150.'' The only evidence adduced by the plaintiff on the subject of damages was testimony to the effect that it would cost between $30 and $50 to remove the berm caused by the ditch enlargement; and the testimony of one expert witness that without the drainage ditch and the berm running through it the Frustuck property had a value of $10,000, but that in its present condition the value of the property was $5,000. This witness based his valuation of $10,000 on the absence of any impairment of the land by the ditch or any easement thereon for the discharge of waters. No evidence was presented at all as to the value of the land as it existed immediately prior to the enlargement of the ditch. It is an uncontradicted and conceded fact that prior to the act of enlargement a ditch was already there for the purpose of carrying the flow of surface waters discharged by the 20-inch culvert. The contour of the land was not only then impaired by the ditch, but it was also, as found by the trial court, subject to a public easement for the discharge of waters from the upper lands.

It is apparent, therefore, that the $5,000 valuation is not the difference in the value of the land before and after the trespass perpetrated by the act of enlarging the ditch because there is no basis for such a valuation. It appears, however, that the diminution of the value of the land to the extent of $5,000, as found by the court, was not predicated upon the enlargement of the ditch, but that these damages were awarded for the additional burden imposed on the land by the increase in the quantity of surface waters discharged thereon as a result of the diversion. This conclusion is warranted by the trial court's specific finding that the physical

act of the City in enlarging the ditch damaged the plaintiff in the sum of $150, and is supported, further, by the trial court's conclusion of law and its judgment that if the City would, within four months after judgment, divert the flow of all surface water in excess of that which would be carried by a culvert 20-inches in diameter the "said sum of $5,000 shall not be payable. . . ." This interpretation of the trial court's findings is assisted further by the trial court's "Decision." While the trial judge's memorandum of decision may not be used to impeach, modify or add to the findings, it may be used for the purpose of discovering the process by which he arrived at his conclusion, and as an aid in interpreting his findings where they are unclear and where interpretation is necessary. (*1st Olympic Corp.* v. *Hawryluk, supra,* 185 Cal.App.2d 832, 838.) That assistance is needed here, so we turn to the court's decision where it is indicated that the $5,000 damages were awarded for the damage occasioned by the increased flowage.[4]

 According to the trial court's findings, the award of $5,000 was made for the diminution in the value of the land caused by the increased flowage. This finding is without substantiation in the record. The plaintiff not only failed to produce evidence to show that any damage was occasioned by the increased flow, but she also failed to present any evidence that the value of her property was diminished by such flowage. The expert witness produced by her, as we have pointed out above, purported to testify to a diminution in value occasioned by the presence of the ditch and the easement on the Frustuck property. He did not testify, or purport to testify, concerning any diminution in value occasioned by the in-

---

[4] "'Insofar as the trespass is concerned it appears that City's action merely increased an existing burden on plaintiff's property which already interfered with its maximum utilization and that the damages, aside from those continuing because of the excess flowage, are limited to restoring the land to what the Court has found was its natural condition in 1950. This sum is fixed at $150.00.'"

"'. . . . . . . . . . . .

"'The Court cannot presume what the parties may wish to do prospectively in respect to their respective rights and obligations. If nothing is done about the situation, plaintiff, if she wishes to utilize her property, is not only forced to provide for the flowage of the waters with which her property is legally burdened, but must also provide for the waters for which City is responsible.

"'The Court finds that her damages in this regard for the continuing burden on her property, being the damage for increased flowage in perpetuity, and the excess cost of works to provide for the same over the cost of work for the natural flow, is the sum of $5,000.00.'"

creased flow of water. A reference to the trial court's decision indicates that the $5,000 award was predicated upon the future and purported to award prospective damages for the "increased flowage in perpetuity" and for the "excess cost of works" in the future to provide for the increased flowage "over the cost of work for the natural flow. . . ." No evidence was proffered, moreover, as to cost of or the nature of the works in the future required to provide for the increased flowage.

 Ordinarily, the recognized measure of damages in cases such as this is the difference in the value of the real property immediately before and immediately after the injury. (*Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193, 200 [143 P.2d 12]; *LeBrun* v. *Richards,* 210 Cal. 308, 319 [291 P. 825, 72 A.L.R. 336].) This method, however, is not exclusive. Accordingly, where appropriate to a particular situation, the measure of damages may be the cost of making repairs (*Natural Soda Products Co.* v. *City of Los Angeles, supra,* p. 201; *LeBrun* v. *Richards, supra,* pp. 319-320); the loss of use of the property (*Natural Soda Products Co.* v. *City of Los Angeles, supra,* p. 201; *Willoughby* v. *Southern Pacific Co.,* 83 Cal.App.2d 414, 415 [188 P.2d 816]); lost profits (*Inyo Chemical Co.* v. *City of Los Angeles,* 5 Cal.2d 525, 542 [55 P.2d 850]); loss of prospective profits (*Natural Soda Products Co.* v. *City of Los Angeles, supra,* p. 201; *Inyo Chemical Co.* v. *City of Los Angeles, supra,* p. 542); increased operating expenses pending repairs (*Inyo Chemical Co.* v. *City of Los Angeles, supra,* p. 542); all of the detriment proximately caused by the injury as in other tort actions (*Skupen* v. *Imperial Irr. Dist.,* 33 Cal.App.2d 392, 395 [91 P.2d 910]; *Barr* v. *Branstetter,* 42 Cal.App. 725, 733 [184 P. 409]) and present and prospective damages that are the natural, necessary or reasonable incident of the taking of property (*Janssen* v. *County of Los Angeles,* 50 Cal.App.2d 45, 50 [123 P.2d 122]). It has also been held, in a nuisance case, that if it appears improbable as a practical matter that a nuisance can or will be abated, the plaintiff should not be left to the troublesome remedy of successive actions, but should be entitled to recover damages for anticipated injury to land. (*Spaulding* v. *Cameron,* 38 Cal.2d 265 [239 P.2d 625].) Whatever the proper measure of damages may be, in a given case, the recovery therefor is still subject to the fundamental rule that damages

which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery. (*City of Menlo Park* v. *Artino*, 151 Cal.App.2d 261, 270 [311 P.2d 135]; *Arnerich* v. *Almaden Vineyards Corp.*, 52 Cal. App.2d 265, 272 [126 P.2d 121].) ▮ Moreover, even where damages are recoverable for prospective detriment, the occurrence of such detriment must be shown with such a degree of probability as amounts to a reasonable certainty that such detriment will result from the original injury. (*Khan* v. *Southern Pac. Co.*, 132 Cal.App.2d 410, 416 [282 P.2d 78].) ▮ In the present case the plaintiff offered no proper evidence at all that she had suffered any legal damage as a result of the diversion of waters and hence left the matter of such damages, if any, to speculation and conjecture. We thus have a case of *"injuria absque damno."* ▮ A wrong without damage does not constitute a cause of action for damages. (*Fields* v. *Napa Milling Co.*, 164 Cal.App.2d 442, 448 [330 P.2d 459, 68 A.L.R.2d 1052]; 35 Cal.Jur.2d, Negligence, § 52, p. 549.) ▮ Accordingly, nominal damages to vindicate a technical right cannot be recovered in a negligence action where no actual loss has occurred. (Prosser on Torts (2d ed.) p. 165; *Fields* v. *Napa Milling Co., supra,* p. 448.) ▮ Actions for the taking and damaging of private property are, as we have pointed out, in the field of tortious action, and hence are subject to the rule that proof of damage is an essential part of the plaintiff's case.

▮ It is also clear from the findings and conclusions of the trial court, and its judgment thereon, that the $5,000 award was intended to compensate for anticipated future injury. The City was thereby put to the election of diverting the flow of all surface water in excess of that which would be carried by a culvert 20 inches in diameter within four months or be subject to the payment of damages in the sum of $5,000.[5] It is apparent that plaintiff could not have both

---

[5]FINDINGS OF FACT:

"9. That the waters, the subject hereof, are storm waters; that insofar as the same do not exceed waters which can be carried by a culvert twenty inches in diameter, plaintiff is bound to receive the same but may divert them in any manner consistent with the drainage pattern as it existed at the time of her acquisition of the property in 1950; that insofar as waters in excess of the foregoing are deposited upon plaintiff's property by defendant, defendant should elect whether to maintain the system constructed by it in 1958 or be perpetually enjoined and restrained from depositing such waters upon plaintiff's property."

remedies. If the City obeyed the injunction to so divert (as it did by reducing the diameter of the 24-inch culvert to 20 inches and constructing another run off channel alongside Sir Francis Drake Boulevard) the threat of the future injury anticipated by the court would be removed. The plaintiff would obtain a double recovery if she could recover for the future injury and also have the cause of that future injury removed.

The City contends, further, that the award of $150 for the act of trespass consisting of the enlargement of the ditch is excessive in that no substantial damage was caused by such trespass. Frustuck invokes the rule of *"de minimis non curat lex."* A perusal of California cases which have applied the latter rule indicates that the amount involved was far less than that awarded in the instant case. (See *e.g., Tomey* v. *Dyson,* 76 Cal.App.2d 212 [172 P.2d 739] ($10); *Moore* v. *Boyd,* 74 Cal. 167 [15 P. 670] ($1.40).) We are not concerned here, however, with the rule of *"de minimis,"* but rather with the question whether the award was excessive.
The claim that damages are excessive concerns an issue which is primarily factual in nature. (*Leming* v. *Oilfields Trucking Co.,* 44 Cal.2d 343, 356 [282 P.2d 23, 51 A.L.R.2d 107].) There is no absolute rule for determining whether an award is excessive. The question in each case must be determined from its own peculiar facts and circumstances. (*Kirschbaum* v. *McCarthy,* 5 Cal.2d 191, 194-195 [54 P.2d 8]; *Power* v. *California St. Cable R.R. Co.,* 52 Cal.App.2d 289, 292-293 [126 P.2d 4].) An appellate court is not warranted in interfering with an award of damages unless it is so grossly disproportionate to any compensation reasonably warranted by the facts presented on appeal as to shock the sense of justice. (*Kirschbaum* v. *McCarthy, supra,* p. 195.)

Although the usual method for determining damages for trespass to real property is on the basis of opinion evidence

CONCLUSIONS OF LAW:
"2. That plaintiff is entitled to judgment against the City of Fairfax for the additional sum of $5,000; provided, however, that if defendant shall within a period terminating four months after judgment becomes final in this action divert the flow of all surface water in excess of that which would be carried by a culvert twenty inches in diameter, said sum shall not be payable and a permanent injunction shall be entered herein enjoining and restraining defendant from depositing any such excess waters upon plaintiff's property and that execution of judgment for said sum of $5,000 shall be stayed during said period of four months." (Similar language is contained in paragraph 7 of the judgment.)

concerning the value of plaintiff's properties before and after the tort (*Natural Soda Products Co.* v. *City of Los Angeles, supra,* 23 Cal.2d 193, 200), this method, however, yields to others if they are more appropriate to a particular situation. Accordingly, a frequent measure of damages is the cost of making repairs. (*Natural Soda Products Co., supra,* p. 201.)

In the instant case the court found that the physical act of enlarging the ditch damaged the plaintiff to the extent of $150. Again adverting to the court's decision for aid we find that these damages were awarded for the purpose of restoring the land to its previous condition. There was evidence that it would cost up to $50 to remove the berm. As to the remaining sum of $100, we cannot say, as a matter of law, that the trial court, having viewed the ditch and having observed the extent of the enlargement, could not determine from its own experience that the cost of repairs would reasonably amount to the sum of $100. (*Butler* v. *Ashworth,* 102 Cal. 663, 666 [36 P. 922].) Having made an observation of the ditch, the court might well have concluded that all that was required was the manual labor necessary to fill the ditch with the dirt from the berm so as to restore it to its former size. Such labor cost would be of a nontechnical character in which case the trial judge may draw on his own knowledge in fixing the value of such services. (*Bean* v. *Wilson,* 120 Cal.App.2d 58, 62 [260 P.2d 134]; *Pensa* v. *Noffsinger,* 105 Cal.App.2d 99, 101 [232 P.2d 521]; *Stiles* v. *Nunes,* 98 Cal. App.2d 739, 740 [220 P.2d 792]; *Lundberg* v. *Katz,* 44 Cal. App.2d 38, 46 [111 P.2d 917].)

### The Injunction

In addition to her action in inverse condemnation and for trespass the plaintiff sought an injunction to restrain the City from continuing to do the acts she claimed constituted a trespass and inverse condemnation. The general rule is that where a taking of private property for public use *is attempted* under the power of eminent domain without any provision having been made for compensation, an injunction will lie. (*Beals* v. *City of Los Angeles, supra,* 23 Cal.2d 381, 388; *Geurkink* v. *City of Petaluma,* 112 Cal. 306, 309 [44 P. 570].) If the property *has been taken* for a public use without any provision being made for compensation, an unqualified injunction may be refused if a public use has intervened. (*Beals* v. *City of Los Angeles, supra,* p. 388.) Accordingly, it has been held that when a public use

*has attached* a prohibitory injunction should be granted only in the event no other relief is adequate. (*Hillside Water Co.* v. *City of Los Angeles,* 10 Cal.2d 677, 688 [76 P.2d 681]; *Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 378 [40 P.2d 486].)

The appropriate course to pursue when such a use has attached is to sue for damages in inverse condemnation, and unless the plaintiff can show good reason why such remedy would not be adequate, he is not entitled to an injunction where a public use has intervened. (*Hillside Water Co.* v. *City of Los Angeles, supra,* p. 688). Moreover, where a property owner permits the completion by a public agency of the work which results in the taking of private property for a public use he will be denied the right to enjoin the agency. His only remedy under such circumstances is a proceeding in inverse condemnation to recover damages. (*Lamb* v. *California Water & Tel. Co.,* 21 Cal.2d 33, 41 [129 P.2d 371]; *Peckwith* v. *Lavezzola,* 50 Cal.App.2d 211, 219-220 [122 P.2d 678]; see *Podesta* v. *Linden Irr. Dist.,* 141 Cal.App.2d 38 [296 P.2d 401].)

In the present case the act of enlarging the ditch and the construction of the 24-inch conduit had been completed prior to this action being filed. The diversion of waters complained of had already taken place. These acts had come to the knowledge of the plaintiff prior to the institution of this action. The record discloses that Frustuck was aware of the increase in the flowage of waters and that she had discussed the drainage problem with the City's officials as early as 1950 and from time to time thereafter. She was also aware of the enlargement of the ditch and the construction of the 24-inch culvert prior to the bringing of this action. During the performance of this work she had a conversation with the City's superintendent of streets concerning the nature and the purpose of the work, and thereafter with another City official before she filed this action. As to these acts it is clear, under the authorities above cited, that the plaintiff was not entitled to an injunction because the public use had intervened and no showing was made that the remedy by way of damages for inverse condemnation would be inadequate.

The only possible basis for an injunction would be to enjoin any further taking until compensation was made. It appears, however, that because the diversion of the waters had already been accomplished the public use

had also attached, and, therefore, all that remained for adjudication was the assessment of the present and prospective damages that would be the natural, necessary or reasonable incident of the taking and damaging. (*Janssen* v. *County of Los Angeles, supra,* 50 Cal.App.2d 45.) As we have hereinabove indicated, the court made the assessment for present damages and purported to make an assessment of future damages without any proof thereof. The amount of damages was thus put to rest and with it the basis for any injunction.

It appears, moreover, that the trial court did in effect grant a qualified injunction when it decreed that the City would have four months to eliminate the excess flow of water, and that if it did so, it would be absolved from the payment of the prospective damages which the trial court erroneously assessed in the sum of $5,000. The judgment had the effect of putting the City to the election of paying $5,000 damages or submitting to a permanent injunction. If the prospective damages had been established the trial court could not deprive the plaintiff of these damages once the judgment became final. Such an award of damages would have precluded the necessity of any injunction because the only basis for an injunction in eminent domain proceedings is to enjoin an attempted taking or damaging until the compensation is made or provided for. The situation is not altered simply because, aside from the injury for which present damages were assessed, we also have other injury incapable of assessment for the reason that no damage resulting therefrom was shown. Under the circumstances, we are satisfied that the plaintiff is not entitled to an injunction.

In our opinion, the City could not be enjoined from exercising its powers of eminent domain. The drainage of waters being a public use the City had the right incident to such use to discharge drainage waters upon the Frustuck property in excess of those it was entitled to drain thereon pursuant to the public easement it enjoyed, *provided it made just compensation to the plaintiff.* Such right inheres to the City by virtue of the Constitution and its exercise in the future for such a public use may not be enjoined. The only limitation on said right is the requirement for the payment of or provision for just compensation subject to the further limitation that any such attempted taking or damaging may be enjoined until such compensation is made or provided for.

We are, moreover, of the opinion that the trial court could not compel the City to divert the water in excess

of that which can flow through a 20-inch culvert. The City could have elected to stand on its right of eminent domain. It chose, however, to comply with the lower court's direction in this regard. This compliance does not, however, preclude the City from appealing from the injunction on the ground that it has accepted the benefits of a judgment. (See *Schubert* v. *Reich,* 36 Cal.2d 298 [223 P.2d 242] ; *Mears* v. *Mears,* 180 Cal.App.2d 484, 509-510 [4 Cal.Rptr. 618].) The rule that a party cannot accept the benefits of a judgment and then appeal from it is subject to the qualification that, in order to defeat the appeal, it must be shown that the appellant has received and accepted benefits to which he would not be entitled in the event of a reversal of the judgment. (*Browning* v. *Browning,* 208 Cal. 518 [282 P. 503] ; *Mears* v. *Mears, supra,* pp. 509-510.) The reversal of the judgment granting a permanent injunction in the present case would not give the City benefits to which it would not be entitled. Assuming *arguendo,* that its compliance with the order for diversion was a benefit to it, it was not only pursuant to a direction which the trial court did not have the authority to make, but also a course of conduct which the City was entitled, in any event, to perform voluntarily irrespective of such order. We are of the opinion, moreover, that this portion of the order was severable from the order for permanent injunction. Where different portions of a judgment are severable, a party by voluntarily accepting the fruits of one portion thereof does not necessarily estop himself to attack other and severable portions thereof on appeal. (*Preluzsky* v. *Pacific Co-operative C. Co.,* 195 Cal. 290, 293 [232 P. 970] ; *Mears* v. *Mears, supra,* p. 509.)

### The Statute of Limitations

The City, by its answer, asserted the affirmative defense of the statute of limitations and asserted that the causes of action were barred by the provisions of subdivision 2 of section 338 of the Code of Civil Procedure. This section provides that an action for trespass upon or injury to real property must be commenced within three years. The instant action was filed on January 19, 1959. The trial court concluded that the City was estopped to assert the statute of limitations. This conclusion was predicated upon a finding that from 1950 to 1958 the City ''continually negotiated with plaintiff for the disposal of said excess storm waters; . . .''

 In *Wilson* v. *Beville,* 47 Cal.2d 852, fn. page 861 [306

P.2d 789], the Supreme Court states that there is some question as to whether section 338, subdivision 2, of the Code of Civil Procedure or the five-year statute required to obtain title by adverse possession is applicable to inverse condemnation suits. (Code Civ. Proc., §§ 318, 319; and see 18 Cal.Jur.2d, Eminent Domain, § 382, p. 100.) In cases where the action was classified as one of trespass the three-year period prescribed in section 338, subdivision 2, has been applied. (*Robinson* v. *Southern Cal. Ry. Co., supra,* 129 Cal. 8; *Williams* v. *Southern Pac. R. R. Co.,* 150 Cal. 624 [89 P. 599]; *Ocean Shore R. R. Co.* v. *City of Santa Cruz,* 198 Cal.App.2d 267, 270 [17 Cal.Rptr. 892].) Other cases have applied the five-year statute, the basis being the taking or damaging of private property under the power of eminent domain. (*Ocean Shore R. R. Co.* v. *City of Santa Cruz, supra,* pp. 271-272; *Martin* v. *Western States G. & E. Co.,* 8 Cal.App.2d 226, 230-231 [47 P.2d 522]; *Katenkamp* v. *Union Realty Co.,* 11 Cal.App.2d 63, 66 [53 P.2d 387]; *Katenkamp* v. *Union Realty Co.,* 36 Cal.App.2d 602, 619 [98 P.2d 239]; *Podesta* v. *Linden Irr. Dist., supra,* 141 Cal.App.2d 38, 51.) The rationale of these latter cases is that the owner's right of recovery is founded upon and grows out of his title to land and that until such title is lost by adverse possession the owner should have the right to maintain an action to recover that which represents the property itself. We are of the opinion that the applicable statute of limitation is that found in the five-year limitation. We reason that acts constituting inverse condemnation amount to more than those of simple trespass. The former involve the taking or damaging of real property for a public use. When an act of trespass amounts to a taking or damaging for a public use it is more than a mere trespass *on* an interest in land, but it takes from the owner of the land something necessary and essential to the use and enjoyment of the property and thus results in the taking away of a valuable property right. ▉ To put the matter at rest, we are satisfied that section 338, subdivision 2, applies to acts of trespass or injury to property which do not involve the taking or damaging of private property for a public use pursuant to article I, section 14 of the California Constitution.

If the five-year statute is applicable, the defendant has not pleaded the statute of limitations because it has pleaded the wrong section. ▉ The defendant elected to plead the statute pursuant to the method prescribed in Code of Civil Procedure section 458. It is necessary for a defendant who

pleads in this manner to specify the applicable section, and, if such section is divided into subdivisions, to specify the particular subdivision or subdivisions thereof. If he fails to do so the plea is insufficient. (*Davenport* v. *Stratton,* 24 Cal.2d 232 [149 P.2d 4]; *Overton* v. *White,* 18 Cal.App.2d 567 [64 P.2d 758, 65 P.2d 99]; *Hopkins* v. *Hopkins,* 116 Cal.App.2d 174 [253 P.2d 723]; *Horwath* v. *Roosevelt Hotel Co.,* 118 Cal. App.2d 1 [257 P.2d 56].) Assuming that the statute was properly pleaded, the date to keep in mind is January 19, 1954. It appears that the diversion of the waters by the school property improvement occurred in 1956 and 1957, and that the Marinda Oaks development took place from 1950 to 1958. As we have pointed out above, the trial judge viewed the subdivision maps and plans. From this view he might have concluded that diversion of waters occurred in Marinda Oaks between 1954 and 1958. In any event, the statute does not run from the time the act of diversion is committed but from the date the injury resulting therefrom is sustained. (*Smith* v. *City of Los Angeles,* 66 Cal.App.2d 562, 583-585 [153 P.2d 69]; *Daneri* v. *Southern Cal. Ry. Co.,* 122 Cal. 507 [55 P. 243]; *Veterans' Welfare Board* v. *City of Oakland,* 74 Cal.App.2d 818, 830 [169 P.2d 1000].) In the present case there was evidence of overflow up to the year 1958, but no evidence that any injury was sustained as a result thereof. The final act of diversion occurred in September 1958 when the 24-inch culvert was constructed in conjunction with the enlargement of the ditch. Here again the only evidence of injury proffered and proved was the enlargement of the ditch. This, like the culvert construction, occurred not only within the five-year period but within the three-year period provided for in section 338, subdivision 2. In view of these considerations we need not discuss the question of estoppel to plead the statute.

*The Order Made Subsequent to Judgment*

A special order made after judgment is appealable. (Code Civ. Proc., § 963, subd. 2.) Such an order is appealable even though it, or any portion thereof, is void. (*Phelan* v. *Superior Court,* 35 Cal.2d 363, 370 [217 P.2d 951].) In order to be appealable, however, such an order must affect the judgment in some manner or bear some relation to it either by way of enforcing it or staying its execution. (*Harmon* v. *Harmon,* 184 Cal.App.2d 248 [7 Cal.Rptr. 280]; *Simmons* v. *Santa Barbara Ice etc. Co.,* 162 Cal.App.2d 23 [327

P.2d 141].) The motion in the present case was made by the defendant City, apparently pursuant to Code of Civil Procedure section 675 pertaining to the satisfaction of judgments, and sought the entry of a satisfaction of paragraph 7 of the judgment. This paragraph provided that if the City should, within a period of four months after judgment became final, divert the flow of all surface water in excess of that which the defendant had a right to flow on the land (i.e., that which would be carried by the public easement consisting of the 20-inch culvert, the ditch as it existed prior to its enlargement, and the 18-inch culvert leading therefrom) the sum of $5,000 should not be payable and a permanent injunction would be made and entered enjoining and restraining the City from depositing such excess waters upon the plaintiff's property. By affidavit in support of the motion the City asserted that it had complied with this portion of the judgment. Any order made by the court pursuant to such motion, would, of course, relate to the judgment and its enforcement. The judgment being final, the only issue left for future consideration was the fact of compliance or noncompliance with its terms. (*Lyon* v. *Goss*, 19 Cal.2d 659 [123 P.2d 11]; *Bakewell* v. *Bakewell*, 21 Cal.2d 224, 226-227 [130 P.2d 975].)

 The subject order contained certain findings and conclusions which are set out in their entirety in the footnote.[6] These findings and conclusions are necessarily restricted to the motion. They cannot be considered as amendments or modifications of the trial court's findings and conclusions upon

---

[6] "The Court now finds:

"1. That the sum of $201.25 has been paid plaintiff in satisfaction of the provisions of paragraph '6' of the Judgment made and entered herein on June 6, 1961.

"2. That defendant has reduced the capacity of the culvert leading to plaintiff's property to a capacity not in excess of that of a culvert of a diameter of twenty inches.

"3. That defendant has erected works which is alleges [*sic*] will divert excess surface waters, if any, away from the property of plaintiff; that no opinion is expressed or finding made by the Court as to the efficacy or legality of such works.

"4. That by its actions in the premises defendant has abandoned all right and claim of right to flowage over the property of plaintiff other than as provided in paragraph '3' of said Judgment.

"5. That defendant by reducing the size of the culvert has complied with the conditions of paragraph '7' of said Judgment regarding the diversion of waters in so far as said question can be resolved in the absence of the *existance* [*sic*] waters in excess of those which can be carried by a twenty inch culvert.

"6. That the sum of $5000.00 for which provision is made in paragraph '7' of said Judgment shall not be payable and plaintiff is entitled to a permanent injunction as provided therein."

which the judgment is predicated (*Knapp* v. *City of Newport Beach*, 186 Cal.App.2d 669, 682 [9 Cal.Rptr. 90]), but as determinations incident to compliance or noncompliance with the terms of the judgment. These findings and conclusions indicate that, based on the affidavits, the court found that the City had elected to comply with the option granted by the trial court to divert the flow of all surface waters in excess of that which would be carried by a culvert 20 inches in diameter. Such a finding was proper, as was the conclusion drawn therefrom that the City had abandoned the right and claim of right to the flowage of water over the property of the plaintiff other than provided in paragraph 3 of the judgment.[7] This conclusion, of course, had to do with the acts of inverse condemnation before the trial court and is not to be construed as a restriction upon future exercise by the City of its right of eminent domain. The effect of these findings and conclusions was to place the case in the posture where the acts of inverse condemnation had been removed and abated, and the damages caused thereby fully compensated. The parties were thus restored to where they were when the instant action was instituted. Under these circumstances, and in the light of the principles relative to injunctive relief in inverse condemnation cases, there is no basis or necessity for such relief. Accordingly, those portions of such order which purport to enjoin the City from depositing waters in excess of those provided for in paragraph 3 of the judgment are void and of no effect.

The judgment is affirmed insofar as it adjudicates: the

---

[7] "3. That said property of plaintiff was at the time of said 1950 judgment and it ever since has remained and now is subject to an easement for the flowage of uplands surface water in the amount which was wont to flow thereon, on December 11, 1950; that on December 11, 1950, defendant City of Fairfax maintained a twenty inch culvert under Sir Francis Drake Boulevard which carried all of the surface water for the flowage of which said easement was then and now [is] subject; that said easement proceeds southerly along the easterly side of said property of plaintiff and just south of the center thereof intersects with an eighteen inch culvert of defendant which runs westerly across the property of plaintiff; that the waters from said twenty inch culvert are entitled to flow and that said easement includes the right of defendant to have the same flow down the said ditch on the easterly side of plaintiff's property to said eighteen inch culvert, and then so far as said eighteen inch culvert will carry the same, westerly through the eighteen inch culvert and off of the property of plaintiff; that said easement did on December 11, 1950 and ever since has and now does, include the right to flow the excess waters which may come through said twenty inch culvert and which will not be carried by said eighteen inch culvert, southerly by a ditch which proceeds on down the easterly side of plaintiff's property to the southerly limit thereof.''

plaintiff's title; declares and delineates the nature and extent of the public easement for the discharge of surface waters; decrees that, except to the extent afforded by the said public easement (as set forth in paragraph 3 of the judgment), the City did not possess or acquire any easement to flow water upon the property except by acts of inverse condemnation; and award damages to plaintiff in the sum of $150 and costs of suit in the sum of $51.25.

The election given to the City to divert the excess flow of waters within the four months' period having been complied with by the City, the propriety of the trial court's direction in that respect is now moot and hence requires no adjudication on our part.

The judgment is reversed insofar as it awards damages in the sum of $5,000 for inverse condemnation and grants a permanent injunction.

With respect to the order for partial satisfaction it is affirmed insofar as it directs satisfaction of the judgment for $150 and $51.25 costs, and it is reversed in all other particulars. Accordingly, paragraphs 2 and 3 of said order are vacated and set aside.[8]

Each party shall bear its own costs on appeal.

Bray, P. J., and Sullivan, J., concurred.

---

[8]Said paragraphs read as follows:

"2. That defendant be and it is hereby permanently enjoined and restrained from depositing any waters on plaintiff's property in excess of those referred to in paragraph '3' of the Judgment made and entered herein on June 6, 1961 to which Judgment reference is made for a description of the property of plaintiff and the flowage rights to which it is subject.

"3. That this Court reserves jurisdiction to grant appropriate relief for any violation of the terms of said Judgment or this permanent injunction."